**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **TOM LEWIS, et al.,** | : | |
| | : | **Case No. C2-11-CV-0058** |
| | : | |
| **Plaintiffs,** | : | **JUDGE ALGENON L.** |
| | : | **MARBLEY** |
| | : | |
| **v.** | : | **Magistrate Judge Terence P. Kemp** |
| | : | |
| **THE HUNTINGTON NATIONAL BANK,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**<u>OPINION & ORDER</u>**

**I. INTRODUCTION**

This matter is before the Court on "Defendant's Motion for Partial Summary Judgment
and Memorandum in Opposition to Plaintiffs' Motion for Conditional Certification, Expedited
Discovery and Court Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 USC
216(B)." (Doc. 36.)  This Court ruled on "Plaintiffs' Motion for Conditional Class Certification,
Expedited Discovery and Court-Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29
U.S.C. § 216(b)," (Doc. 30), in an Opinion and Order filed on May 23, 2011, (Doc. 45).  The
scope of this Opinion and Order, therefore, is limited and addresses only Defendant's Motion for
Partial Summary Judgment.  The Court heard oral argument from the parties on January 25,
2012.  For the reasons that follow, Defendant's Motion for Partial Summary Judgment is
**DENIED**.

## II. BACKGROUND

*A. The Lawsuit*

1. Factual History[1]

Plaintiffs are current or former Mortgage Loan Officers ("MLOs") employed by Defendant The Huntington National Bank ("Huntington" or "Defendant") during the time period from January 2008 to the present.[2]  Huntington is a regional bank headquartered in Columbus, Ohio.  Huntington's banking activities include marketing and selling mortgage loan products in a number of states.  As MLOs, Plaintiffs sell Huntington's residential mortgage products.

The majority of MLOs who are Plaintiffs in this lawsuit work in-house at Huntington.  A MLO at Huntington is required to have a General Education Development (GED) or high school education, but does not have to complete any pre-certification or in-service training prior to beginning work.  According to deposition testimony and declarations obtained from various Huntington employees who are or were employed as MLOs, or supervise or work with MLOs, the typical duties of an MLO include talking with customers, identifying loan products for those customers, and entering information into a computer program which helps the MLO determine whether a particular customer pre-qualifies or qualifies for a particular loan.  The computer program also directs the MLO to additional documentation that must be collected to substantiate the loan.  A number of MLOs stated in their declarations that their primary job duty is selling residential mortgage products.  Huntington also encourages MLOs to cross-sell other financial

---

[1] These facts are taken in part from this Court's May 23, 2011 Opinion and Order.  (Doc. 45.)

[2] The statute of limitations period for claims brought under the Fair Labor Standards Act, the statute at issue in this lawsuit, is two years under most circumstances, but three where the employer's violation of the Act is found to have been willful.  *See* 29 U.S.C. § 255.  The potential liability period in this case, therefore, began on January 18, 2008 (three years prior to the date that Plaintiffs filed their original Complaint on January 18, 2011, (Doc. 1)).

products, including checking and savings accounts, homeowner insurance, and investments, and to refer customers to the appropriate bank department.  MLOs are not required to "review, consider, discuss or analyze their consumers' long or short term financial goals or their overall financial circumstances" or "advise a consumer regarding their financial circumstances."  (Doc. 100 at 16–17.)

MLOs do not have underwriting authority or authority provisionally to approve mortgages.  Some MLOs stated in their declarations that they do not have the authority to offer lower interest rates on their own, and that they are unable to waive or to discount required applications fees.  In the event fees are not collected, MLOs will be subject to having those fees deducted from their compensation.  MLOs are evaluated on their ability to produce mortgage sales, productivity, customer satisfaction, and timeliness related to complying with deadlines.  If MLOs are unable to meet certain production goals, they will be subject to a Performance Improvement Plan, and can eventually be terminated.

Huntington pays the majority of its MLOs according to its Production Commission and Incentive Compensation Plan ("Plan").  Huntington pays those MLOs who work out of Huntington's corporate offices under its Production Commission and Incentive Compensation Plus Salary Plan ("Salary Plan").  All MLOs are paid under one of these two plans.  MLOs paid under the Plan receive only commission earned for loans closed, and MLOs paid under the Salary Plan receive a combination of commission and salary.  Huntington pays its MLOs in bi-monthly draws that it offsets against the employee's commission earnings, which are paid only after a mortgage closes.

Plaintiffs challenge two of Huntington's wage practices.  First, although a number of MLOs have stated in their declarations that they sometimes work more than forty hours per

week,[3] neither the Plan nor the Salary Plan provide for payment of overtime.  From the inception

of the MLO position, around the fall of 2004, until the spring of 2011, Huntington has always

classified MLOs as administratively exempt from the minimum wage and overtime

compensation provisions of the FLSA and has never paid MLOs overtime compensation or

required them to document hours worked.  Plaintiffs allege that Defendant "unlawfully

classified, and continue to unlawfully classify, Plaintiffs . . . as exempt from overtime payments

under federal and State Law, despite the fact that they are not exempt."  (Second Am. Compl. ¶

14.)  Second, Huntington deducted from the MLOs' bi-monthly draws money that it failed to

recoup from mortgage applicants and the cost of the MLOs' personal assistants.  These

deductions were made without the MLOs' consent and were for losses for which the MLOs were

not responsible.  Only Plaintiffs' first challenge to Huntington's practices is at issue in

Defendant's Motion for Partial Summary Judgment.

## 2. Procedural History

Plaintiff Tom Lewis filed a three-count complaint on January 18, 2011.  (Doc. 1.)

Plaintiff then filed two amended complaints, the first adding Plaintiff Matthew Coulter, and the

second removing several named defendants and replacing them with Huntington only.  (Doc. 15

& 26.)  The Second Amended Complaint, filed on March 11, 2011, includes three claims:

(1) violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, on

behalf of all MLOs employed by Huntington since January 18, 2008 who were denied overtime

compensation and compensated based under the Plan or the Salary Plan ("Nationwide Class");

(2) violations of the Ohio Minimum Fair Wage Standards Act ("Ohio Wage Act"), Ohio Rev.

---

[3] Plaintiff Tom Lewis, for example, stated in an affidavit that he regularly worked over 70 hours per week to ensure deadlines were met.  A number of other MLOs stated they were expected to work on weekends and evenings, and often worked approximately 50–60 hours per week.  (Doc. 100 at 9–10.)

Code §§ 4111.01, 4111.03, 4111.10, on behalf of all MLOs employed at Huntington's Ohio branches since January 18, 2008 who were denied overtime and compensated under the Plan or the Salary Plan ("Ohio Subclass"); and (3) violations of the Ohio Prompt Pay Act ("Ohio Pay Act"), Ohio Rev. Code § 4113.15, on behalf of the Ohio Subclass.  Plaintiffs' FLSA claims are asserted as a collective action pursuant to 29 U.S.C. § 216(b), and the state wage and hour claims are asserted as a class action pursuant to Federal Rule of Civil Procedure 23.

Plaintiffs filed a "Motion for Conditional Class Certification, Expedited Discovery and Court-Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b)" in March of 2011, (Doc. 30), and Defendant filed its opposition to that motion and Motion for Partial Summary Judgment thereafter, (Doc. 36).   Plaintiffs also filed an "Emergency Motion for Protective Order, Cease and Desist Order, the Immediate Granting of Plaintiffs' Motion for Court Supervised Notice, Sanctions, and Corrective Actions" in May of 2011.  (Doc. 40.)  This Court granted in part and denied in part both of Plaintiffs' motions in its May 23, 2011 Opinion and Order.  (Doc. 45.)  It authorized Plaintiffs to proceed collectively pursuant to 29 U.S.C. § 216(b),[4] and to date, 114 Plaintiffs have joined this action.  (Doc. 45 & 100.)

In their Motion for Partial Summary Judgment, Defendant moves the Court to:

(1) dismiss Plaintiffs' overtime compensation claims under the FLSA and Ohio Wage Act[5] with

---

[4] The Court explain that time was of the essence because "the commencement of a collective action under § 216(b) does not toll the statute of limitations period for plaintiffs who have failed to opt-in," (Doc. 45) (quoting *Musarra v. Digital Dish, Inc.*, No. C2-05-545, 2008 U.S. Dist. LEXIS 110003, at *7 (S.D. Ohio Mar. 24, 2008)), and, therefore, "the motion for conditional class certification should be addressed before Huntington's defense on the merits is ripe," *id.* (citing *Heaps v. Safelite Solutions, LLC*, No. 2:10 CV 729, 2011 U.S. Dist. LEXIS 40089, at *4 (S.D. Ohio Apr. 5, 2011)).

[5] Section 4111.03(A) of the Ohio Revised Code states: "An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's wage rate for hours worked in excess of forty hours in one workweek, in the manner and methods provided in and subject to the exemptions of section 7 and section 13 of the 'Fair Labor Standards Act of 1938,' 52 Stat. 1060, 29 U.S.C.A. 207, 213, as amended."  Huntington argues that, in light of this language, "a state-law overtime compensation claim

prejudice; (2) grant partial judgment in this matter on behalf of Defendant; and (3) deny
Plaintiffs' Motion for Conditional Class Certification, Expedited Discovery and Court-
Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. § 216(b).  Because this
Court has already ruled on Plaintiffs' Motion for Conditional Class Certification, Expedited
Discovery and Court-Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C.
§ 216(b), the scope of this Opinion and Order is limited to Defendant's first and second requests
for relief.  The U.S. Department of Justice ("DOJ") filed a Statement of Interest on January 18,
2012, which this Court also has taken under consideration.  (Doc. 112.)  The Court heard oral
argument and this matter is now ripe for decision.

### B. Statutory & Regulatory Background

The FLSA generally requires covered employers to pay minimum wages and overtime
compensation for hours of work exceeding 40 in a workweek at a rate of one and one-half times
an employee's regular rate of pay.  29 U.S.C. §§ 206(a), 207(a)(1).  Exempt from the minimum
wage and overtime compensation provisions of the FLSA, however, is any employee who is
"employed in a bona fide . . . administrative . . . capacity."  29 U.S.C. § 213(a)(1).  Any
employees that qualify as administratively exempt, therefore, are not entitled to overtime
compensation under the FLSA.

The Wage and Hour Division ("WHD") of the Department of Labor ("DOL") administers
and enforces the FLSA, and issues regulations and interpretations of those regulations.  In 2004,
the WHD revised its regulations governing administratively exempt employees under the FLSA.
29 C.F.R. §§ 541.200–541.204.  Moreover, the WHD has issued three Opinion Letters and one
Administrator's Interpretation total—two issued prior to the regulation revisions and two after—

---

necessarily fails if the FLSA claim fails."  (Doc. 36) (citing *Gibbs v. Montgomery Cnty. Agric. Soc'y*, 140
F. Supp. 2d 835, 844 (S.D. Ohio 2001)).  This Court agrees.

interpreting its regulations to determine the status of MLOs under the administrative exemption.[6]
This Court will summarize the interpretations and revised regulations issued by the WHD
chronologically.  It is necessary to have a general understanding of the interpretations and
regulations to discern the underlying dispute in this lawsuit.

1. The 1999 Opinion Letter

In May of 1999, the WHD issued an Opinion Letter in response to a request regarding the
exempt status of MLO under § 213(a)(1).  Opinion Letter, 1999 DOLWH LEXIS 54 (Dep't of
Labor May 17, 1999) ("1999 Opinion Letter").  The MLOs employed by the requestor of the
Opinion Letter were responsible for developing new business for their employer by contacting
prospective borrowers and referral sources; evaluating the borrowers' financial situation and
providing a pre-qualification letter; consulting with borrowers to obtain the best loan package
available; working with lenders in selecting loan programs for borrowers; consulting with
borrowers regarding desirability of locking in a given interest rate; assisting the borrowers in
preparing a loan application; presenting and obtaining borrowers' signatures; submitting loan
applications to the central office; and consulting with loan processors or borrowers to resolve any
problems.  *Id.* at *1–2.  The MLOs were subject to minimal supervision by branch managers.  *Id.*
at *2.

---

[6] Prior to 2010, the DOL communicated its interpretations of the FLSA and its regulations by issuing
public Opinion Letters in response to questions submitted by private parties.  The WHD changed its
practice in 2010, and started issuing Administrator's Interpretations "when determined, in the
Administrator's discretion, that further clarity regarding the proper interpretation of a statutory or
regulatory issue is appropriate."  Wage and Hour Division, Rulings and Interpretations, Administrator
Interpretations, http://www.dol.gov/whd/opinion/opinion.htm (last visited February 3, 2012).  The WHD
explained that it believes "this will be a much more efficient and productive use of resources than
attempting to provide definitive opinion letters in response to fact-specific requests submitted by
individuals and organizations, where a slight difference in the assumed facts may result in a different
outcome."  *Id.*

Based on the information provided, a member of the Office of Enforcement Policy, Fair Labor Standards Team[7] concluded the MLOs were not exempt and had to be paid in accordance with the minimum wage and overtime compensation provisions of the FLSA.  *Id.* at *3–4.  The activities described, explained the Fair Labor Standards Team member, "appear to require the use of skills and experience in applying techniques, procedures, or specific standards rather than the exercising of discretion and independent judgment."  *Id.*  As will be explained further below, to qualify as administratively exempt, an employee's primary duty must include the exercise of discretion and independent judgment.  Moreover, the MLOs appeared to be "engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business," which also supported a conclusion that the MLOs were not exempt.  *Id.* at *3.

## 2. The 2001 Opinion Letter

A letter was filed in response to the 1999 Opinion Letter, requesting that the WHD reconsider its finding in the 1999 Opinion Letter that MLOs were not exempt "in light of the advisory duties they perform on behalf of their employer's customers."  Opinion Letter, 2001 DOLWH LEXIS 5, at *1 (Dep't of Labor Feb. 16, 2001) ("2001 Opinion Letter").  Specifically, the response letter pointed out that the MLOs worked with borrowers to create loan packages that best met the goals of the borrowers while complying with various lender requirements.  *Id.* The MLOs selected from a wide range of loan packages and supervised the processing of the transaction until closing.  *Id.*  In order for the MLO to perform these duties, the employer explained, the MLO had to understand a customer's credit history and financial goals.  *Id.*

---

[7] The Office of Enforcement Policy, Fair Labor Standards Team is part of the WHD of the DOL.

A member of the Fair Labor Standards Team found that while it agreed the primary duties of the MLOs were the performance of office or nonmanual work directly related to management policies or general business operations, MLOs were not exercising the necessary discretion and independent judgment to be considered administratively exempt. *Id.* at *2–3. The WHD explained that it appeared that the MLOs were "using their skill and knowledge in applying techniques, procedures, and/or specific standards (such as loan-to-value rations and debt ratios) in choosing already established loan packages," and such tasks did not demonstrate the requisite exercise of discretion and independent judgment to categorize the MLOs as administratively exempt. *Id.*

### 3. The 2004 Revisions to the WHD's Regulations

The revisions to the regulations addressing administratively exempt employees under the FLSA became effective on August 23, 2004. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122 (Apr. 23, 2004) (to be codified at 29 C.F.R. pt 541) (hereinafter "Defining the Exemptions"). Under the revised 29 C.F.R. § 541.200, an administratively exempt employee under the FLSA is one who is:

(1) compensated on a salary or fee basis at rate of not less than $455 per week;
(2) whose primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or employer's customers"; and
(3) whose primary duty also includes "the exercise of discretion and independent judgment with respect to matters of significance."[8]

Section 541.201(a) explains that to perform "work directly related to the management or general business operations," an employee "must perform work directly related to assisting with the

---

[8] As alluded in the subsections above, the language in § 541.200 was already contained in the regulations prior to the 2004 revisions.

running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  This can include work in finance, and "employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt."  29 C.F.R. §§ 541.201(b), (c).

An employee exercises discretion and independent judgment when he or she compares and evaluates possible courses of conduct, and acts or makes a decision after considering various possibilities.  29 C.F.R. § 541.202(a).  Whether an employee is exercising discretion and judgment is a fact-specific inquiry.  29 C.F.R. § 541.202(b).  Nevertheless, factors to consider are whether the employee:

(1)  has authority to formulate, affect, interpret, or implement management policies or operating practices;
(2)  carries out major assignments in conducting the operations of the business;
(3)  performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
(4)  has authority to commit the employer in matters that have significant financial impact;
(5)  has authority to waive or deviate from established policies and procedures without prior approval;
(6)  has authority to negotiate and bind the company on significant matters;
(7)  provides consultation or expert advice to management;
(8)  is involved in planning long- or short-term business objectives;
(9)  investigates and resolves matters of significance on behalf of management; and
(10) represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.*  The exercise of discretion and independent judgment does not include "clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work."  29 C.F.R. § 541.202(e).

Finally, § 541.203 was added as a new provision to the regulations in 2004 that provides "administrative exemption examples."  Of import here is subsection (b), which provides:

>Employees in the financial services industry generally meet the duties
>requirements for the administrative exemption if their duties include work such as
>collecting and analyzing information regarding the customer's income, assets,
>investments or debts; determining which financial products best meet the
>customer's needs and financial circumstances; advising the customer regarding the
>advantages and disadvantages of different financial products; and marketing,
>servicing or promoting the employer's financial products. *However, an employee*
>*whose primary duty is selling financial products does not qualify for the*
>*administrative exemption.*

29 C.F.R. § 541.203(b) (emphasis added).

The preamble to the 2004 revised regulations explains that § 541.203(b) is consistent

with case law that distinguishes between exempt and nonexempt financial service employees

based on the primary duty they perform.  Defining the Exemptions, 69 Fed. Reg. at 22146.  Prior

to the regulatory revisions, federal courts had found that "employees who represent the employer

with the public, negotiate on behalf of the company, and engage in sales promotion [were]

exempt administrative employees, even though the employees also engaged in some inside sales

activities."  Defining the Exemptions, 69 Fed. Reg. at 22145 (citing *Reich v. John Alden Life Ins.*

*Co.*, 126 F.3d 1, 10 (1st Cir. 1997) (finding that employees were administratively exempt where

their activities—which included maintaining contact with hundreds of independent sales agents

to keep them apprised of the employers financial products, inform them of changes in prices, and

discuss how certain products might fit customer needs—involved servicing of the business

because their work was "in the nature of 'representing the company' and 'promoting sales' of

John Alden products"); *Hogan* v. *Allstate Ins. Co.*, 361 F.3d 621, 627 (11th Cir. 2004) (holding

employees were administratively exempt where their duties included "promoting sales, advising

customers, adapting policies to customer's needs, deciding on advertising budget and techniques,

hiring and training staff, determining staff's pay, and delegating routine matters and sales to said

staff"); *Wilshin* v. *Allstate Ins. Co.*, 212 F. Supp. 2d 1360, 1376–79 (M.D. Ga. 2002) (finding

employee met administrative exemption where his responsibilities included recommending products and providing claims help to different customers, as well as using his own personal sales techniques to promote and close transactions)).  But a federal court had held, alternatively, that the administrative exemption was not available for employees who had a "'primary duty to sell [the company's] lending products on a day-to-day basis' and 'failed to exercise discretion and independent judgment.'"  Defining the Exemptions, 69 Fed. Reg. at 22145 (quoting *Casas v. Conseco Fin. Corp.*, No. Civ. 00−1512 (JRT/SRN), 2002 WL 507059, at \*9 (D. Minn. Mar. 31, 2002)).

#### 4. The 2006 Opinion Letter

The WHD issued another Opinion Letter in 2006, this time signed by the WHD Administrator himself, addressing whether certain MLOs were administratively exempt from the minimum wage and overtime compensation provisions of the FLSA.  Opinion Letter, 2006 DOLWH LEXIS 42, at \*1, 19 (Dep't of Labor Sept. 8, 2006) ("2006 Opinion Letter").  This time, however, the WHD found that the MLOs qualified under the exemption.  *Id.* at \*12−19.

The MLOs at issue in the 2006 Opinion Letter worked with employer's customers to assist them in identifying and securing mortgage loans.  *Id.* at \*4.  The MLOs did this by responding to on customer leads; collecting and analyzing customer financial information; assessing customer financial circumstances to determine if the customer would qualify for a loan; and advising the customer about the risks and benefits of the loan alternatives.  *Id.*  Some of the MLOs used technological tools to assist in communicating a loan prequalification, loan pre-approval, or qualified loan approval.  *Id.* at \*5.  The MLOs sales activities were described as "customer-specific persuasive sales activity, such as encouraging an individual potential customer to do business with his or her employer's mortgage banking company rather than a

competitor, or to consider the possibility of a mortgage loan if they have not expressed prior interest." *Id.*

Based on this description of MLO job duties provided, the WHD concluded that the MLOs had "a primary duty other than sales, as their work includes collecting and analyzing a customer's financial information, advising the customer about the risks and benefits of various mortgage loan alternatives in light of their individual financial circumstances, and advising the customer about avenues to obtain a more advantageous loan program." *Id.* at *12–13. The WHD noted, however, that if a MLO's primary duty was selling mortgage loans, the MLO would not qualify under the exemption. *Id.* at *13 n.3. In other words, the 2006 Opinion Letter was based on the specific facts presented to it in the request. The WHD drew similarities between the MLOs and the employees in *John Alden, Hogan*, and *Wilshin* because the MLOs "service their employer's financial services business by marketing, servicing, and promoting the employers financial products." *Id.* at *14 (citing *John Alden*, 126 F.3d at 8–14; *Hogan*, 361 F.3d at 626–28; *Wilshin*, 212 F. Supp. 2d at 1376–79). Finally, the WHD held that the fact that the MLOs used software programs and tools did not necessarily disqualify them from the administrative exemption for lack of discretion and independent judgment. *Id.* at *14–15.

### 5. The 2010 Administrator's Interpretation

In March of 2010, the WHD issued an Administrator's Interpretation regarding the application of the administrative exemption to employees who perform the typical job duties of a MLO. Administrator's Interpretation No. 2010-1, 2010 DOLWH LEXIS 1, at *1 (March 24, 2010) ("2010-1 AI"). The WHD found that the primary duty of a MLO is making sales on behalf of his or her employer, which is not directly related to the management or general business operations of the employer or the employer's customers, and therefore, MLOs did not

meet the requirements under the administrative exemption.  *Id.* at *30.  The WHD withdrew the

2006 Opinion Letter "[b]ecause of its misleading assumption and selective and narrow analysis."

*Id.*  The 2001 Opinion Letter was also withdrawn because the member of the Fair Labor

Standards Team had concluded, incorrectly, that the primary duties of the MLO were office and

nonmanual work directly related to management policies or generally business operations (even

though the ultimate conclusion of the Opinion Letter was that MLOs were not administratively

exempt).  *Id.*

     The WHD examined federal case law to determine the typical job duties of an MLO, and

found that those duties included the following:

(1) Receiving internal leads and contacting potential customers, or receiving contacts from customers;
(2) Collecting required financial information from customers including information about income, employment history, assets, investments, home ownership, debts, credit history, assets, investments, home ownership, debts, credit history, prior bankruptcies, judgments, and liens;
(3) Running credit reports;
(4) Entering collected financial information into a computer program that identifies which loan products may be offered to customers;
(5) Assessing the loan products identified, discussing with the customers the terms and conditions of particular loans, trying to match the customers' needs with one of the company's loan products;
(6) Compiling customer documents for forwarding to an underwriter of loan processor; and
(7) Finalizing documents for closing.

*Id.* at *3–4.   The WHD explained that the "case law and regulatory distinction between servicing

the business and routine sales work requires an examination of whether an employee who

performs the typical job duties of a mortgage loan officer has the primary duty of making sales."

*Id.* at *13.  MLOs typical job duties indicate, the WHD reasoned, their primary duty is making

sales.  *Id.* at *15–16.  The WHD pointed out that "employers often train their mortgage loan

officers in sales techniques and evaluate their performance on the basis of their sales volume."

*Id.* at *18.  Typical day-to-day duties of MLOs "do not relate to the internal management or

general business operations of the company," and fall "squarely on the production side of the business." *Id.* at *23.  The WHD also clarified that an employee is only exempt when he or she meets the requirements under § 541.200, and contrary to the assumption made by the Administrator in the 2006 Opinion Letter, § 541.203(b) only provides examples of exempt employees and does not provide an alternative standard for the exemption. *Id.* at *28–29.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant therefore has the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.  If the moving party meets its burden, then the non-moving party is under an affirmative duty to point out specific facts in the record, which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992).  The non-moving party may not rest merely on allegations or denials in its own pleadings, *see Celotex*, 477 U.S. at 324, but must present "significant probative evidence" to show that there is more than "some metaphysical

doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 Fed.3d 335, 340 (6th Cir. 1993).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim.  *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).  Instead, the court may rely on the evidence called to its attention by the parties.  *Id.*

## IV. LAW & ANALYSIS

### A. Huntington's Good Faith Defense under the Portal-to-Portal Pay Act

Huntington asserts that it has established an affirmative good faith defense under the Portal-to-Portal Pay Act and, consequently, should be awarded summary judgment on Plaintiffs' overtime compensation claims.  Once an employer establishes this good faith defense, Huntington contends, it has "absolute immunity from paying unpaid overtime compensation, liquidated damages, court costs, or attorney's fees for FLSA violations."  (Doc. 32) (citing *Schneider v. City of Springfield*, 102 F. Supp. 2d 827, 832 (S.D. Ohio 1999); *Marshall v. Baptist Hosp., Inc.*, 668 F.2d 234, 239 (6th Cir. 1981) (explaining that "where the defense is established it acts to deprive the court of any further jurisdiction")).

The Portal-to-Portal Pay Act states, in pertinent part, that:

> In any action or proceeding based on any act or omission . . . no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section . . . .

16

*See* 29 U.S.C. § 259(a). Subsection (b)(1) includes the Administrator of the WHD of the DOL. 29 U.S.C. § 259(b)(1). If an employer can prove this affirmative defense, it will act as a bar to "the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect." 29 U.S.C. § 259(a).

To establish a good faith affirmative defense under § 259, an employer must show that it acted in: (1) reliance on; and (2) conformity with a WHD regulation, Opinion Letter, or Administrator's Interpretation; and (3) in good faith. 29 U.S.C. § 259(a); *Frank v. McQuigg*, 950 F.3d 590, 598 (9th Cir. 1991); *Hultgren v. Cnty. of Lancaster, Neb.*, 913 F.2d 498, 507 (8th Cir. 1990); *see Schneider*, 102 F. Supp. 2d at 832. This Circuit has explained that in close cases, courts should consider "the reasonableness of the employer's actions in light of the administrative interpretation in question." *Marshall*, 668 F.2d at 238. But this Court is also mindful that federal courts have noted that the "burden of proof is a heavy one, since a defense under § 259 would act as a bar to this proceeding, thereby absolving [the defendant] of liability and penalties for any past FLSA violations." *See, e.g.*, *Figas v. Horsehead Corp.*, Civil Action No. 06-1344, 2008 WL 4170043, at *21 (W.D. Pa. Sept. 3, 2008).

Defendant contends that material facts establish the merits of its affirmative defense, while Plaintiffs argue genuine issues of material fact exist as to whether Huntington has met its burden with respect to each element of the defense. This Court finds, for reasons explained at greater length below, that genuine issues of material fact exist as to whether Huntington relied on the 2006 Opinion Letter and whether Huntington conformed to the 2006 Opinion Letter.[9] As a

---

[9] It is unnecessary to address whether Huntington acted in good faith under the Portal-to-Portal Pay Act at this time since Huntington has failed to meet its burden with respect to elements (1) and (2). If an

result, this Court will not reward summary judgment in Huntington's favor on the basis that it has established an affirmative defense under the Portal-to-Portal Pay Act.

### 1. Reliance

Huntington argues that it relied upon the 2004 regulations and 2006 Opinion Letter in continuing to classify its MLOs as exempt, and that the deposition testimony of Annette Houck, Huntington's corporate counsel establishes this fact.  Specifically, Defendant points out that Houck "was aware of the 2004 regulation and 2006 Opinion Letter immediately after their release, reviewed the materials at length and specifically relied on them in reviewing and maintaining the prior exempt classification conclusion in consideration of the actual MLO job duties."  (Doc. 111 at 6.)

Houck consulted with both internal and external experts in drawing her conclusion that MLOs were exempt from the minimum wage and overtime compensation provision of the FLSA. For example, she consulted with Robert Nussbaum, a Compensation Manager, and Bob Davis, an attorney who was "intimately involved with the formulation of the financial services example in the 2004 regulations."  *Id.*  Houck also conducted an audit in 2005 of the MLO position with Nussbaum and the Corporate Human Resources Manager, Shirley Graham, in which she considered the job description and training provided to MLOs, and had discussions with the "Mortgage Group manager, and individuals who directly managed the MLOs, individuals who reported to the MLOs and individuals who worked in collaboration with the MLOs, to assess the

---

employer has established that it relied on and acted in conformity with an Opinion Letter, it is usually implied that the employer has also acted in good faith.  *Frank*, 950 F.3d at 598 ("The Portal Act and its regulations strongly imply that an employer who relies on and conforms to an Opinion Letter which specifically address him and his circumstances is acting in good faith.").  Because this Court finds that Huntington has not met its burden of proof with respect to elements (1) or (2), it is unnecessary to examine element (3) since it typically turns on a determination as to the first two elements.

MLOs' job duties." *Id.* at 7. Houck also gave a presentation to the MLOs' managers regarding the administrative exemption and financial services industry example in the 2004 revised regulations after the audit was completed. After the 2006 Opinion Letter was released, Houck consulted with attorneys who were familiar with the Letter and the Mortgage Retail Division Manager "to discuss and assess the MLOs' job duties in light of the 2006 Opinion Letter." *Id.* at 8.

Plaintiffs argue that Huntington has not established that it actually relied on the 2006 Opinion Letter in either formulating or maintaining its policy of exempting MLOs, and therefore, cannot sustain its burden on summary judgment. Houck testified that Huntington always classified the MLOs as exempt, despite the 1999 and 2001 Opinion Letters. Plaintiffs contend that this demonstrates that there is a genuine issue of material fact as to whether Huntington actually relied upon the 2004 revised regulations (specifically the new provision, 29 C.F.R. § 541.203) and 2006 Opinion Letter. (Doc. 100) (citing *Figas*, 2008 WL 4170043, at *22 (finding defendant arguing it had an affirmative defense under § 259 was not entitled to summary judgment where the policies it had predated the DOL's Opinion Letters upon which it claimed to have relied); *In re Cargill Meat Solutions Wage and Hour Litig.*, 632 F. Supp. 2d 368, 392 (M.D. Pa. 2008) ("Cargill at no time changed its payment/non-payment policy at the Hazelton Plant since its inception in January of 2002. At the very least, there is a genuine question of material fact as to whether Cargill acted in good faith in relying on the June 6, 2002 opinion letter.")). Plaintiffs conceded at the summary judgment hearing, however, that Huntington had a right to rely on the 2006 Opinion Letter.

Huntington relies on *Quinn v. New York State Electric and Gas Corporation*, 621 F. Supp. 1086, 1091 (N.D. N.Y. 1985), to support its argument that an employer should be granted

summary judgment where the employer establishes that it relied on a regulation in maintaining a policy established before the regulation was promulgated.  In *Quinn*, an employee brought an action under the Age Discrimination in Employment Act ("ADEA") against its employer seeking relief from the employer's policy of age discrimination in selection of employees for positions in its training program.  621 F. Supp. at 1088.  The employer argued it relied in good faith on a regulation that exempted bona fide apprenticeship programs from provision of the ADEA, and was protected under the Portal-to-Portal Pay Act affirmative defense.  *Id.*  at 1089.  The regulation exempting bona fide apprenticeship programs was first promulgated in 1969, and the employer presented evidence that it had relied on that regulation in maintaining a policy of setting an age limit for the program that had been in place since 1958.  *Id.* at 1090.

The Court concluded that the defendant employer had established, "as a matter of law, the defendant relied on the regulation allowing an exemption from ADEA provisions for bona fide apprenticeship programs when it continued to maintain the maximum age limit for entry into [the apprenticeship program]."  *Id.* at 1091.  The defendant was aware of the regulations and consulted the regulations to ensure compliance.  *Id.* at 1090.  Notably, however, the 1969 regulation was the first of its kind, and it had never been preceded by a conflicting regulation.

In *Figas,* the case Plaintiffs rely on to counter Huntington's position, employees of a zinc processing facility brought a FLSA action against their employer that had a practice of not paying the employees for the time they spent donning and doffing their protective clothing, showering, and walking to and from the locker rooms.  2008 WL 4170043, at *1–2.  The employer argued that it had an affirmative defense under § 259 because it had relied on two Opinion Letters from 2007.  *Id.* at *22.  But the court held the employer could not establish its affirmative defense at the summary judgment stage because its practice of not compensating its

employers for their donning, doffing, and washing time predated the 2007 Opinion Letters, and the employer's practice of nonpayment was contrary to, rather than in accordance with, the applicable DOL rulings for much of its history. *Id.*

This Court finds that Huntington is unable to satisfy the first element of its § 259 affirmative defense at the summary judgment stage. Huntington's policy of treating MLOs as exempt predated the 2006 Opinion Letter. And prior to the 2006 Opinion Letter, the 1999 and 2001 Opinion Letters categorized MLOs as not exempt.[10] Similar to the employer in *Figas*, therefore, Huntington's practice of treating MLOs as exempt was not in accordance with the applicable WHD Opinion Letters, for part of its history. *See* 2008 WL 4170043, at *22. Moreover, the facts of this case are distinguishable from the facts in *Quinn,* because in *Quinn,* the employer was never maintaining a policy incongruous with regulations or interpretations where the employer's policy predated the regulation upon which it was claiming to have relied. *See* 621 F. Supp. at 1086. Although Huntington has provided detailed information about the steps its general counsel took from 2004 until the present to ensure MLOs were being properly characterized as exempt in light of the 2004 revised regulations and 2006 Opinion Letter,

_____

[10] Huntington draws a distinction between Opinion Letters signed by the WHD Administrator and those signed by subordinate employees at the DOL. Specifically, Defendant points to text formerly available on the DOL's website explaining that an Opinion Letter signed by an Administrator is an official ruling for purposes of the Portal-to-Portal Act, while Opinion Letters signed by other WHD officials do not constitute rulings or interpretations under the Act.

While this Court does find this distinction relevant, it does not change the fact that at the time Huntington established its policy of treating MLOs as administratively exempt, the only interpretations from the WHD categorized MLOs as administratively exempt. This fact supports the Court's conclusion that there is, indeed, a genuine issues of fact regarding whether the Defendant did in fact rely on the WHD's interpretation, or whether it established its policy without taking into consideration the existing WHD interpretations.

Huntington has provided no explanation or information as to why it initially categorized MLOs as exempt despite the existence of the 1999 and 2001 Opinion Letters from the WHD.

### 2. Conformity

Even if Huntington was able to establish the first element of its affirmative defense under the Portal-to-Portal Pay Act at the summary judgment stage, this Court would nevertheless be unable to award summary judgment because Huntington has not proven the second element of its defense: conformity.  To demonstrate conformity with a WHD Opinion Letter, an employer must prove that "its actions actually conformed with the letter" and that the "circumstances described in the opinion letter" match the employer's own "actual circumstances."  *Hultgren*, 913 F.2d at 507; *Frank*, 950 F.3d at 598.  The conflicting evidence presented by the parties, as to the typical duties of the MLOs, indicates that there is a genuine issue of material fact as to whether the duties of MLOs at Huntington matched the duties of the MLOs described in the 2006 Opinion Letter.

Absent from Huntington's briefs are facts indicating Houck had a discussion with a MLO regarding his or her primary job duties—rather than a MLO supervisor, manger, etc.—during the time period that she was evaluating whether Huntington's MLOs were exempt under the 2004 revised regulations and 2006 Opinion Letter.  Defendant's reply brief contains facts detailing how Houck met with "individuals who directly managed the MLOs, individuals who reported to the MLOs and individuals who worked in collaboration with the MLOs" to assess whether the exemption applied.  (Doc. 111.)  Yet, as Plaintiffs point out, it appears Huntington's "'audit' failed to interview, either individually or in a group setting, a single MLO," and "[n]o MLOs were talked to about what they perceived their primary duties were and no one in management observed any MLOs doing their job so as to independently confirm that the actual performance

22

of the job by an MLO was consistent with the either the [*sic*] CFR or the Opinion Letter."  (Doc. 100, p. 36, 36 n.49.)  Defendant also fails to articulate what exactly Houck determined the typical duties of an MLO at Huntington were as a result of her audit and various discussions with management and supervisors.

Plaintiffs, on the other hand, have recounted lengthy testimony from actual MLOs describing their duties at Huntington, and a reasonable trier of fact could determine that those duties did not qualify the MLOs as administratively exempt under the relevant 2004 revised regulations and the 2006 Opinion Letter.  A reasonable jury could conclude that Huntington has not demonstrated conformity with the 2006 Opinion Letter because it has failed to show that the circumstances described in the Opinion Letter actually match the circumstances at Huntington.

For example, the MLOs at issue in the 2006 Opinion Letter collected and analyzed customer financial information and advised the customers about the risks and benefits of loan alternatives.  2006 Opinion Letter, at *4.  Plaintiffs have provided evidence that MLOs at Huntington did not perform these types of duties.  Rather, Plaintiffs support the following statements with extensive declaration testimony from the MLOs at Huntington: (1) MLOs do not provide any services to customers beyond those necessary to sell mortgages, (Doc. 100 at 31−34); (2) MLOs are not required by Huntington to determine the best financial product for the customers, *id.* at 34; and (3) Huntington does not have any policies, procedures, or training that require MLOs to provide a heightened level of financial services to customers, *id.* at 34−35.

Defendant relies on *Marshall* to support its argument that it acted in conformity with the 2006 Opinion Letter.  (Doc. 111) (citing 668 F.2d 234).[11]  In *Marshall*, the Sixth Circuit held that

---

[11] Despite being decided in 1981, this Court's research revealed that *Marshall* is one of the Sixth Circuit's more recent cases addressing the Portal-to-Portal Pay Act defense at length.  The *Schneidger* court

a hospital was insulated from retroactive liability for minimum wages otherwise due to X-ray students where the administrative interpretation at issue was ambiguous as to whether the students were exempt from relevant provision of the FLSA.  *Id.* at 238.  The first sentence in the regulation at issue stated that: "Whether a student training for certain paramedical occupations is viewed as an employee of a hospital . . . will depend on all the circumstances of a student's activities on the premises of the establishment."  *Id.* at 237.  The second sentence in the regulation, however, stated that the WHD "will not assert that a student in training to become . . . X-ray technician . . . or for any other paramedical position where on-the-job training is combined with classroom lectures and laboratory instruction to comprise an extensive program of education generally leading to a degree or to licensing, registration or certification by an appropriate board or society is an employee of the hospital where so engaged."  *Id.*

While the regulation itself was somewhat ambiguous given a conflict between the first and second sentences, it was clear that the hospital was acting in conformity with the second sentence of the regulation when it categorized its X-ray students as exempt in reliance on the regulation.  *Id.* at 238 ("One sentence, the first, suggests that the administrative agency retains discretion to judge medical training programs on a case by case basis. The next sentence then provides a specific rule that eliminates agency discretion in cases involving nurses and X-ray technicians. The two sentences would be inconsistent unless the second sentence is read as an exception to the first.").  The issue in *Marshall* did not involve making a determination as to the typical duties of an X-ray students, or whether the students at issue could be categorized as X-ray students under the regulation, but whether the actual regulation clearly exempted X-ray students. *Id.*  Here, the 2006 Opinion Letter is not ambiguous as to whether the MLOs discussed in the

---

recognized that the Sixth Circuit has had limited opportunity to examine the Portal-to-Portal Pay Act affirmative defense.  102 F. Supp. 2d at 833.

2006 Opinion Letter were exempt. The issue is whether Huntington was conforming to the Letter, and if Huntington's actual circumstances matched the circumstances described in the Letter.

Huntington may, ultimately, be able to persuade a finder of fact that it actually relied upon and acted in conformity with the 2006 Opinion Letter, and is thus entitled to a good faith affirmative defense under the Portal-to-Portal Pay Act, but it has not met its burden at this stage of the litigation. Huntington's Motion for Partial Summary Judgment is **DENIED** on the grounds that Defendant has established that it is entitled to a good faith affirmative defense under the Portal-to-Portal Pay Act. *See* 29 U.S.C. § 259.

### B. Enforceability of the 2010-1 AI

1. The Administrative Procedure Act's Notice and Comment Rulemaking Procedures

Huntington argues that this Court should set aside the 2010-1 AI because it was unlawfully promulgated. Huntington contends that the 2010-AI "impermissibly reverses the DOL's prior definite interpretation set forth in the 2006 Opinion Letter without adhering to the APA's [Administrative Procedure Act's] notice and comment rulemaking procedures," and that the 2010-1 AI is subject to judicial review under APA § 706. (Doc. 36) (citing 5 U.S.C. § 706(2)(A)). Huntington concedes that the standard under APA § 706 is highly deferential, but explains that courts may reverse the DOL's action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and encourages this Court to do so here. *Id.* (citing *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A))).

Defendant relies on *Paralyzed Veterans of American v. D.C. Arena*, to support its contention that "[o]nce an agency gives its regulation an interpretation, it can only change that

interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Id.* (citing 117 F.3d 579, 586 (D.C. Cir. 1997); *see also Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment."). Huntington contends that the Sixth Circuit adopted the reasoning of these D.C. cases in *Dismas Charities, Inc. v. U.S. Dep't. of Justice*, 401 F.3d 666, 679 (6th Cir. 2005).  The 2006 Opinion letter was a formal, written pronouncement of the WHD's interpretation of its regulations because, Huntington argues, it was "published via legal research tools and on its website for purposes of providing compliance guidance."  *Id.*  In the 2010-1 AI, the WHD expressly withdrew its 2001 and 2006 Opinion letters, and admitted that because the 2010-1 AI "unambiguously represents a change in the [WHD's] interpretation of its administrative exemption regulations," applies only prospectively.  *See* 2010-1 AI.

Plaintiffs counter that Defendant's argument has no merit.  No notice and comment period is required where, as here, the WHD issued an interpretation of an existing regulation, in contrast to promulgating a new regulation.  The APA expressly exempts interpretive rules from the notice and comment requirements.  (Doc. 100) (citing 5 U.S.C. § 553(b)(A)).  Huntington also argues that the Sixth Circuit has drawn distinctions between the interpretative rules that substantively create law and interpretive rules that merely clarify or explain existing law.  *Id.* (citing *Dismas Charities*, 401 F.3d at 679 ("The rulemaking requirements of § 553 of the APA do not  apply to 'interpretative rules.'"); *First Nat. Bank of Lexington, Tenn. v. Sanders*, 946 F.2d 1185, 1188–89 (6th Cir. 1991) ("For purposes of the APA, substantive rules are rules that create

law. . . . [i]nterpretative rules merely clarify or explain existing law or regulations and go to what the administrative officer thinks the statue or regulation means") (internal quotations omitted)).

Plaintiffs rely on case law from the First, Second, Fourth, Seventh, and Ninth Circuits, finding that changes in agency interpretations do not require notice and comment because both the original and current positions constitute interpretive rules.  Plaintiffs also cite one case from the Eastern District of Michigan in which the court explicitly rejected the argument that the 2010-1 AI was improperly-promulgated "rulemaking" under the APA.  *See Biggs v. Quicken Loan, Inc.*, Case No. 10-cv-11928, 2011 WL 5244819 (E.D. Mich. Mar. 21, 2011).

The United States concurs with Plaintiffs' position in its Statement of Interest:

In exempting interpretive rules from its ambit, the APA creates a dichotomy between notice-and-comment-exempt interpretative rules and substantive or legislative rules, which are covered by the APA's notice and comment requirement.  An interpretative rule is one that is "issued by an agency to advise the public of [its] construction of the statute and rules which it administers," [*Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)] . . . whereas substantive or legislative rules "create law" by imposing new obligations pursuant to authority delegated by Congress, *First Nat'l Bank v. Sanders*, 946 F.2d 1185, 1188 (6th Cir. 1991) (quoting *So. Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985)).  Because the 2010 AI is clearly an interpretive rule, the plain language of the APA, together with the Supreme Court and Sixth Circuit cases construing the APA compel the conclusion that the 2010 AI is exempt from notice and comment requirements and therefore validly issued.

(Doc. 112.)

The party that challenges an agency's action as arbitrary and capricious bears the burden of proof.  *City of Olmsted Falls, Ohio v. Federal Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002).  Whether an agency has complied with the APA's notice and comment requirements is a question of law for the courts, and if a court finds noncompliance, vacating the agency action is the standard remedy.  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

There are two statutes at issue here.  First, Huntington urges this Court to set aside the 2010-1 AI using its powers under 5 U.S.C. § 706(2)(A), which provides, in pertinent part, that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Second, Huntington argues that this Court should do so because the 2010-1 AI impermissibly reverses the DOL's prior definite interpretation set forth in the 2006 Opinion Letter without holding a notice and comment period as required under 5 U.S.C. § 553.  Section 553(b) states that "[g]eneral notice of proposed rulemaking shall be published in the Federal Register," but explicitly notes that this requirement does not apply "to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," § 553(b)(A).

This Court cannot ignore the plain language of § 553(b)(A), the Supreme Court case law, specifically *Guernsey*, and Sixth Circuit case law, and, therefore, declines Defendant's invitation to set aside the 2010-1 AI.  *See Guernsey*, 514 U.S. at 99 ("Interpretative rules do not require notice and comment"); *Friedrich v. Sec'y of Health and Human Servs.*, 894 F.2d 829, 830–32 (6th Cir. 1990) (holding rules that apply the language of a legal enactment to specific facts are interpretive rules exempt from the APA's notice and comment requirement); *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 947 (6th Cir. 2000) (finding that a Medicare manual provision that set forth a new formula for exemptions to Medicare reimbursement caps was interpretive and "creates no new law," and therefore exempt from the notice and comment requirements); *Dismas Charities*, 401 F.3d at 670 (finding two Bureau of Prisons memoranda were exempt from the notice and comment requirements of the APA because they were interpretive, rather than legislative).

The 2010-1 AI is best categorized as an interpretive rule.  2010-1 AI did not "create law" but merely "clarif[ies] or explain[s] existing law or regulations."  *First Nat. Bank of Lexington, Tenn.*, 946 F.2d at 1189.  Huntington does not argue that each time WHD issued an Opinion Letter—in 1999, 2001, and 2006—a notice and comment period was necessary because the WHD was "creating law."  It would follow, however, that if this Court adopted Huntington's position, a notice and comment period would have been necessary in each instance.  Especially in 2006 when the WHD's Opinion Letter departed from its precedent in 1999 and 2001, and characterized MLOs as administratively exempt.

This Court finds Huntington's reliance on *Dismas Charities* unavailing.  The Sixth Circuit, relying on *Alaska Prof'l Hunters*, drew a distinction between an agency interpretation of a statute and a regulation.  401 F.3d at 682.  The Circuit explained:

> It is true that once an agency gives a *regulation* an interpretation, notice and comment will often be required before the interpretation of that regulation can be changed. . . . This is because once an agency has promulgated its own regulation, a change in the interpretation of that regulation is likely to reflect the agency's reassessment of wise policy rather than a reassessment of what the agency itself originally meant. . . . However, when an agency is changing its interpretation of a *statute*, it is much more likely that the agency is not trying to determine what is the wiser rule, but what *is* the rule.

*Id.* (emphasis in original).  However, the Sixth Circuit drew this distinction in *dicta*.  The *Dismas Charities* court also made clear that notice and comment "will often" be required before the interpretation of a regulation was modified.  *Id.*  The court did not state that notice and comment would be required every time an agency modifies its interpretation of a regulation.  Rather, sometimes, notice and comment might be necessary.[12]  This Court does not find the reasoning in *Dismas Charities*, articulated in *dicta*, persuasive here.

_____

[12] The Court would also like to note that the *Dismas Charities* court's reasoning related to "wise policy" appears to be somewhat undermined by the plain language of 5 U.S.C. § 553(b)(A), which exempts both

Huntington has failed to demonstrate that the 2010-1 AI was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This Court finds that it was well-within WHD's discretion to issue Opinion Letters and Administrator's Interpretations of the FLSA Regulations.  Accordingly, Defendant's Motion for Partial Summary Judgment is **DENIED** on the grounds that the 2010-1 AI was unlawfully promulgated and should be set aside by this Court.

## 2. The 2010-1 AI's Consistency with the WHD's Regulations

Huntington contends that the 2010-1 AI should be set aside because it is inconsistent with the plain language of 29 C.F.R. § 541.203(b).  Huntington argues that while the same MLO duties are discussed in § 541.203(b) and the 2010-1 AI, the 2010-1 AI concludes those duties are non-exempt sales activities, while § 541.203(b) reaches the opposite conclusion.  The preamble to the 2004 revised regulations and the case law cited therein, Defendant argues, is inconsistent with the 2010-1 AI.  (Doc. 36) (citing Defining the Exemptions, 69 Fed. Reg. at 22146 ("many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to customers"); *Hogan*, 361 F.3d at 627 (finding employees were administratively exempt even though they also sold insurance products to existing and new customer); *Wilshin*, 212 F. Supp. 2d at 1375–78 (noting that selling financial products to an individual consumer, rather than agent, broker, or company, is not enough of a distinction to negate exempt status)).  Huntington also argues that in the 2010-1 AI the WHD relied incorrectly on DOL regulations that define outside sales exemptions, 29 C.F.R. §§ 541.500, 541.503, to determine whether MLOs were administratively exempt.

---

"interpretative rules" and "general statements of policy" from the APA's notice and comment requirements.

Plaintiffs counter that the plain language of § 541.203(b) is not contrary to the 2010-1 AI, noting that § 541.203(b) "merely provides an example of how the administrative duties test in § 541.200(a) may be applied to financial service employees; it does not provide an alternative test." (Doc. 100.)  The 2010-1 AI applies the test set forth in § 541.200(a), consistently with the example contained in §541.203(b), and consequently, there can be no serious argument that 2010-1 AI was either erroneous or inconsistent with the 2004 revised regulations.  Plaintiffs also contend that Defendant's argument related the WHD's reliance in the 2010-1 AI on 29 C.F.R. §§ 541.500, 541.503 has no merit.  WHD merely consulted the "outside sales exemption in determining whether an employee's primary duty is making sales," *id.*, and Huntington provides no persuasive argument as to why this would make the WHD's determination in the 2010-1 AI arbitrary and capricious.  In its Statement of Interest, the United States agrees with Plaintiffs.

An agency's interpretation of its own regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted); *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 880–82 (2011).  Such an interpretation is binding unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."  *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988).  Again, the party that challenges an agency's action as arbitrary and capricious bears the burden of proof.  *City of Olmsted*, 292 F.3d at 271.

Huntington has not met its burden of establishing the 2010-1 AI is "plainly erroneous or inconsistent with the regulation."  *Auer*, 519 U.S. at 461.  Section 541.203(b) provides examples of how the administrative duties test in § 541.200(a) may be applied to financial service employees, rather than an alternative test, and lists duties an exempt employee would normally

perform, and further lists one duty, having a primary duty of sales, that disqualifies an employee from being categorized as administratively exempt.  As explained above, the preamble to the 2004 revised regulations explains that § 541.203(b) is consistent with the existing case law.  The qualifying duties reflect the responsibilities of the financial service employees in three insurance cases, *John Alden*, *Hogan*, and *Wilshin*, and the disqualifying duty reflects the primary duty of loan originators in the *Casas* case.  Defining the Exemptions, 69 Fed. Reg. at 22146.  The WHD discussed and analyzed these cases, and others, in the 2010-1 AI.  This Court concludes that because the 2010-1 AI applies the test set forth in § 541.200(a), consistently with the example contained in §541.203(b), there can be no serious argument that 2010-1 AI was either erroneous or inconsistent with the 2004 revised regulations.  Finally, this Court also finds that it is of no import that the WHD consulted 29 C.F.R. §§ 541.500, 541.503 to help make a determination regarding whether an employee's primary duty is making sales.  Huntington has provided no convincing arguments as to why this should undermine the WHD's analysis in the 2010-1 AI.

Therefore, Defendant's Motion for Partial Summary Judgment is **DENIED** on the grounds that the 2010-1 AI is inconsistent with the WHD's administratively exemption regulation.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

 s/ Algenon L. Marbley
**Algenon L. Marbley**
**United States District Judge**

**Dated: March 12, 2012**